IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 12, 2017 Session

## STEPHANIE KELLER ET AL. v. ESTATE OF EDWARD STEPHEN McREDMOND ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 063004IV       Russell T. Perkins, Chancellor**

_____

**No. M2013-02582-COA-R3-CV**

_____

Sibling shareholders, unable to agree on the management of the family business, brought their dispute to court. Eventually, the brothers and sisters agreed that the business should be dissolved and, under the court's supervision, sold as a going concern. After soliciting bids from the siblings, the court approved the sale of the business's assets to one brother and two of his sisters. Pending the closing, the court ordered the siblings to continue to operate the business as usual and to preserve the goodwill of the business, including the relationships with employees, suppliers, and customers. The day after the closing, the brother who was not part of the winning bidder group opened a competing business. The winning bidders sought damages from the competing sibling, claiming that he willfully violated court orders, breached his fiduciary duty, and intentionally interfered with business relations. After a bench trial, the court awarded the winning bidders compensatory damages in an aggregate amount for all claims. In the first appeal, this Court reversed, holding that the winning bidders' claims were derivative, not direct, and thus they lacked standing. In *Keller v. Estate of McRedmond*, 495 S.W.3d 852, 877 (Tenn. 2016), our supreme court adopted a new standard for determining whether a shareholder claim is direct or derivative and, applying that standard, held that the winning bidders had standing to pursue their claim that the competing sibling violated the court's orders. So our supreme court affirmed in part, reversed in part, and remanded the case to this Court to review the remaining issues that were properly raised but not addressed in the first appeal. *Id.* at 882-83. We affirm the trial court's decision to hold the competing sibling in contempt, but we vacate the aggregate award of compensatory damages.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part; Vacated in Part; and Case Remanded**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Roger A. Maness, Clarksville, Tennessee, for the appellant, Louis A. McRedmond.

John P. Branham, C. David Briley, and Mandy Strickland Floyd, Nashville, Tennessee, for the appellees, Linda McRedmond Orsagh and Anita McRedmond.

Richard K. Smith, Nashville, Tennessee, for the appellee, Estate of Edward Stephen McRedmond.

## OPINION

### I.

In this appeal, we revisit the circumstances surrounding the sale of the assets of a closely-held family corporation, McRedmond Brothers, Inc. ("MBI").[1] MBI, among other things, owned and operated a grease business that purchased used grease for resale to animal feed manufacturers. After the death of the family patriarch, ten McRedmond siblings owned all of the shares of MBI. Two siblings, Louis Anthony McRedmond ("Louie") and Edward Stephen McRedmond ("Stephen"), owned the largest block of shares and managed the day-to-day operations of MBI.

In 2006, various disagreements between Louie and Stephen began to interfere with their joint management of MBI. Complicating matters, an irrevocable Shareholders Agreement precluded the other eight siblings from resolving the impasse. The siblings split into two camps. In 2008, Louie, along with six of his sisters, filed this action against Stephen[2] and the remaining two sisters in the Chancery Court for Davidson County, Tennessee.[3] Initially, the plaintiffs asked the trial court to "declare the management of the corporation [(Louie and Stephen)] deadlocked," and to "declare the Shareholders Agreement terminated." But after the court concluded that the Shareholders Agreement was enforceable, the parties agreed that MBI should be dissolved.

On September 22, 2008, the court, by agreed order, appointed a receiver to immediately take control of MBI's assets, records and business. In the same order, the court directed the receiver to ensure that MBI's grease business was operated in a manner

---

[1] A more detailed factual and procedural background is set forth in *Keller v. Estate of McRedmond*, 495 S.W.3d 852, 855-66 (Tenn. 2016).

[2] Stephen McRedmond passed away during the course of litigation, and his estate was substituted as a party.

[3] The court later consolidated the action with a declaratory judgment action filed by MBI against all of the siblings.

that would "protect its value" and ordered current employees, including Louie, to "continue to conduct the Grease Business in the ordinary course of business, reporting directly to the Receiver." The court also enjoined all parties from taking any actions "as to the business or assets of [MBI]."

In January 2009, the receiver reported to the court that MBI's assets would be worth more to the siblings than to other potential buyers. The receiver proposed selling the business assets to the siblings as a "going concern." After resolution of any creditors' claims, the receiver would distribute the remaining proceeds to the ten siblings pro rata based upon their ownership of MBI. The court approved the receiver's plan.

Stephen and two sisters, Anita McRedmond and Linda McRedmond Orsagh, submitted the winning bid. The only other bidder was Louie, who submitted a bid for the grease business assets only. The receiver and the winning bidders executed an Asset Purchase Agreement for the grease business assets and other MBI holdings. The grease business assets included "the names and any derivations of the names of the business entities which currently own and operate the Businesses [and] the goodwill associated with the foregoing."

On April 1, 2009, the court entered an order approving the receiver's sale of assets, attaching to the order the Asset Purchase Agreement. Pending the sale, the order directed the current officers and directors of MBI, namely Louie and Stephen, to:

> 1. Conduct the Business only in the usual, regular and ordinary course, preserve the organizational structure of the Business, and preserve intact for the Buyer the goodwill of the Business and the present relationship between the Business and the employees, suppliers, clients, customers, and others having business relations with the Seller.
> . . . .
>
> 4. Take all action and . . . do all things necessary, proper or advisable in order to consummate and make effective the transactions contemplated by the agreement of the Buyer to purchase the Business . . . .

The sale closed on April 8, 2009. Later that day, Louie resigned as employee, officer, and director of MBI.

Shortly after the closing, the winning bidders discovered that Louie had been preparing to open his own competing grease business. On March 5, 2009, Louie or his agent filed a charter for his new business, L.A. McRedmond, Incorporated ("LAMI"), with the Tennessee Secretary of State. Also in March 2009, Louie opened a bank account and began buying equipment for LAMI, which he asked MBI employees to deliver to him at the MBI grease plant. Prior to closing, Louie discussed his plans for

3

LAMI with at least two MBI employees and asked them to work for him after the sale and allegedly solicited the business of MBI's largest customer. During his last few days before he resigned, Louie allegedly stopped ordering loads of grease for MBI so that its inventory was almost completely depleted by the date of closing.

The day after closing, LAMI, fully operational as a competing grease business, received its first shipment of grease for resale. LAMI then admittedly targeted MBI's vendors and customers using the same grease plant historically used by MBI. According to Anita, Louie's actions "paralyzed" the new MBI[4] ("New MBI") because, without inventory, it was unable to fill grease orders. By the time the grease inventory was replenished to normal levels, LAMI had captured New MBI's major customers.

The winning bidders sought relief from the trial court. The court entered an order granting their motion for a temporary injunction, enjoining Louie from operating a grease business at the MBI grease plant facility and from interfering with the operations of New MBI. This injunction would later be made permanent.

The court also allowed the winning bidders to amend their answers to the original complaint to include counterclaims against Louie. The winning bidders essentially asserted three claims: (1) Louie willfully and intentionally violated the court's orders; (2) Louie violated his fiduciary duty to MBI; and (3) Louie intentionally interfered with MBI's business relations.

After a three-day bench trial, the court ruled in the winning bidders' favor on all three claims. The court found that Louie intentionally took steps to deplete the inventory of the grease business prior to the sale, set up a competing business on the existing MBI premises, recruited valuable employees away from MBI, and solicited MBI's largest customer. The court determined that Louie's conduct violated its orders of September 22, 2008, and April 1, 2009, and his conduct damaged the winning bidders. The court also found that Louie's actions violated his fiduciary duty to MBI and constituted intentional interference with business relations.

As to damages, the court found that the winning bidders "did not receive what they bargained for in purchasing the 'going concern' assets of the grease business for $758,000.00." Rather, they "received approximately half of what they bargained for, something that was much closer in value to [Louie's] bid of $360,000.00." Thus, the court awarded the winning bidders "compensatory damages in the aggregate amount of $375,000.00." In a footnote, the court explained that it was "merg[ing] all the damages for violating the Court's Orders, intentional interference with business relations, and

---

[4] Before the closing, the winning bidders formed and capitalized a new corporation and assigned their rights and responsibilities under the Asset Purchase Agreement to this new entity. After the closing, MBI changed its name so that the new corporation could take the name "McRedmond Brothers, Inc."

4

breach of fiduciary duties into the aggregate compensatory damages award." The court certified the order as final under Rule 54.02 of the Tennessee Rules of Civil Procedure and found that there was no just reason for delay. Louie then appealed to this Court.

We reversed the trial court's decision, holding that the winning bidders, as individual shareholders, lacked standing to assert the claims alleged. *In re Estate of McRedmond*, No. M2013-02582-COA-R3-CV, 2014 WL 6324283, at *20 (Tenn. Ct. App. Nov. 14, 2014), *aff'd in part, rev'd in part sub nom. Keller v. Estate of McRedmond*, 495 S.W.3d 852 (Tenn. 2016). Applying then-current Tennessee law for determining whether a shareholder claim is direct or derivative, we determined that all three claims were derivative. *Id.* at *17-20.

Our supreme court granted permission to appeal and adopted a new analytical framework for such determinations. *Keller v. Estate of McRedmond*, 495 S.W.3d 852, 877 (Tenn. 2016). The court then applied the new approach to each of the winning bidders' claims to determine whether they as individual shareholders had standing to pursue the claims. *Id.* at 877-82. The court affirmed our holding that the winning bidders did not have standing to assert a claim based on Louie's breach of fiduciary duty to MBI or intentional interference with business relations. *Id.* at 880-81. But the supreme court held the winning bidders did have standing to pursue the civil contempt claim against Louie for any actual damages arising out of his violation of the trial court's orders. *Id.* at 879-80. The court then remanded the case so that we could address, in our discretion, any remaining issues properly raised by the parties in the first appeal that had not yet been decided. *Id.* at 882 & n.38.

## II.

On August 4, 2016, we ordered the parties to file supplemental briefs addressing the remaining issues. Louie presented three issues[5] for our review: (1) whether he intentionally violated the court's orders; (2) if so, whether the winning bidders were actually harmed by his conduct; and (3) whether the damages award was supported by the evidence.[6]

---

[5] Although Louie also argued a fourth issue, the issue only appeared in his supplemental brief and was not designated as an issue presented for review. Thus, we consider this issue waived. *See Forbess v. Forbess*, 370 S.W.3d 347, 356 (Tenn. Ct. App. 2011) ("We may consider an issue waived where it is argued in the brief but not designated as an issue.").

[6] We are unpersuaded by the winning bidders' argument that Louie did not raise the first two issues in his original brief in this Court. By raising the issue of whether the trial court erred in finding that his pre-closing conduct was improper, he preserved the issue of whether his pre-closing conduct violated the court's orders and harmed the buyers.

Under Tennessee Code Annotated § 29-9-102(3) (2012), courts have the power to "issue attachments, and inflict punishments for contempts of court" for "[t]he willful disobedience or resistance of any officer of such courts, party, juror, witness, or any other person, to any lawful writ, process, order, rule, decree, or command of such courts . . . ." Contempt may be either civil or criminal in nature. *Doe v. Bd. of Prof'l Responsibility*, 104 S.W.3d 465, 473 (Tenn. 2003). Civil contempt, which is at issue here, is intended to benefit a private party who has suffered a violation of rights, and "the quantum of proof necessary to convict is a preponderance of the evidence." *Id.* at 473-74.

We review a court's decision to hold a person in civil contempt under the abuse of discretion standard. *Konvalinka v. Chattanooga-Hamilton Cty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008). "A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010) (citations omitted).

Defiance of a court order may constitute contempt if four elements are present:

First, the order alleged to have been violated must be "lawful." Second, the order alleged to have been violated must be clear, specific, and unambiguous. Third, the person alleged to have violated the order must have actually disobeyed or otherwise resisted the order. Fourth, the person's violation of the order must be "willful."

*Konvalinka*, 249 S.W.3d at 354-55 (footnotes omitted). Louie does not dispute that the first two elements were met. But he contends that he did not actually disobey the orders and that his alleged violation was not willful. The third and fourth elements of a civil contempt claim are questions of fact, which we review de novo with a presumption of correctness unless the evidence preponderates otherwise. *Id.* at 356-57; Tenn. R. App. P. 13(d).

The trial court found Louie violated two of its orders by intentionally depleting MBI's grease inventory before the sale, recruiting valuable employees away from MBI, and soliciting the business of MBI's largest customer. The court's September 2008 order directed MBI employees, including Louie, to "continue to conduct the Grease Business in the ordinary course of business." And the court's April 2009 order instructed MBI's employees to "[c]onduct the Business only in the usual, regular and ordinary course, preserve the organizational structure of the Business, and preserve intact for the Buyer the goodwill of the Business and the present relationship between the Business and the employees, suppliers, clients, customers, and others having business relations with the Seller." Louie claims that he was merely preparing to compete with his siblings, an

activity not prohibited by the court's orders. But the record shows that Louie's pre-closing activities went beyond mere preparation to compete.[7]

Contrary to the court's orders, Louie did not conduct MBI's business "only in the usual, regular and ordinary course." Louie asked MBI employees to use an MBI tractor to deliver two tankers he purchased for LAMI to the MBI premises. And the evidence shows that Louie, the person responsible for maintaining inventory before closing, left virtually no inventory in stock on the date of closing. When asked whether he allowed the tanks and tankers to be empty because he knew he was going to resign, Louie answered "Yes." According to Louie, he only "bought enough [grease] to ensure the sales [he] made would be fulfilled."

Louie also did not "preserve intact for the Buyer the goodwill of [MBI] and the present relationship between [MBI] and the employees, suppliers, clients, customers, and others having business relations." Before closing, Louie convinced key MBI employees to work for his competing grease business. And he told customers that MBI's assets were being sold, that he "may be starting a new business," and that he "would like to continue selling grease to them." Although Louie denied soliciting business from MBI's largest customer before the sale, the court apparently discredited this testimony by finding otherwise. *See Richards v. Liberty Mut. Ins. Co.*, 70 S.W.3d 729, 733-34 (Tenn. 2002) ("[F]indings with respect to credibility and the weight of the evidence . . . may be inferred from the manner in which the trial court resolves conflicts in the testimony and decides the case."). We will not second guess the court's credibility determination.

The evidence also does not preponderate against the court's finding that Louie's violation was willful. Willful conduct in the civil contempt context

> consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is 'willful' if it is the product of free will rather than coercion. Thus, a person acts 'willfully' if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

*Konvalinka*, 249 S.W.3d at 357 (quoting *State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Group Trust*, 209 S.W.3d 602, 612 (Tenn. Ct. App. 2006) (citations omitted)). As described above, Louie deliberately took steps to recruit MBI employees, solicit MBI customers, and deplete MBI's grease inventory. His actions were intentional, not accidental or inadvertent.

---

[7] To the extent the trial court found that Louie's post-closing conduct also violated its orders, the court erred. After Louie resigned as an officer, director, and employee of MBI he was no longer bound by the court's orders. But because we conclude that Louie's pre-closing conduct violated the court's orders, the court's error in considering post-closing conduct was harmless.

The determination that the trial court did not abuse its discretion in holding Louie in civil contempt does not end our inquiry. Louie also challenges the court's decision to award compensatory damages to the winning bidders based on his contemptuous conduct. Under Tennessee Code Annotated § 29-9-105,[8] trial courts may award compensatory damages to a party "for injury arising from the [other party's] illegal disobedience of the court." *Overnite Transp. Co. v. Teamsters Local Union No. 480*, 172 S.W.3d 507, 511 (Tenn. 2005). "The measure of damages is the actual injury sustained as a result of the contempt." *Id.* Actual damages, or compensatory damages, consist of "[a]n amount awarded to a complainant to compensate for a proven injury or loss; damages that repay actual losses." *Actual Damages*, BLACK'S LAW DICTIONARY (10th ed. 2014); *see also Compensatory Damages*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining compensatory damages as "[d]amages sufficient in amount to indemnify the injured person for the loss suffered").

Louie contends that the evidence preponderates against the court's finding that his violation of the court's orders actually harmed the winning bidders. We disagree. The court-appointed receiver intended to sell the grease business as a going concern. And the winning bidders submitted their bid based on the value of the business as a going concern. The court's orders were designed to protect that value through the closing date "so that the Buyers would receive the benefit of their bargain." *Keller*, 495 S.W.3d at 879. By depleting the grease inventory, recruiting MBI employees for his own competing business, and telling customers that MBI's assets were being sold, Louie diminished the value of the business assets. Anita testified that the business was "paralyzed" by lack of inventory. And by the time New MBI had replenished the missing inventory, long-time customers, primed by Louie's pre-closing statements, were buying from LAMI. MBI's accountant described the cumulative adverse effect of Louie's actions on New MBI: declining sales, decreased profits, and an overall net loss. Although the winning bidders did not have standing to recover lost profits, evidence of lost profits is "probative of the adverse effect Louie's conduct had on the value of the grease business assets at the time of the closing." *Id.* at 881 n.35.

This brings us to the amount of damages awarded by the trial court. Because the court awarded a lump sum of $375,000 to compensate the winning bidders for breach of fiduciary duty, interference with business relations, and violation of the court's orders, we cannot determine whether the evidence supports the *amount* of damages awarded. So we vacate the award of damages and remand this case to the trial court for calculation of the winning bidders' direct damages attributable solely to Louie's willful violation of the

---

[8] Tennessee Code Annotated § 29-9-105 governs "[i]f the contempt consists in the performance of a forbidden act." Tenn. Code Ann. § 29-9-105 (2012). On appeal, Louie does not dispute the trial court's authority to award damages under this statute.

court's orders.  *See id*. at 879.  The trial court may, in its discretion, conduct a new hearing on the amount of such damages.

## III.

Because the evidence does not preponderate against the court's findings that Louie violated the court's orders and his violation was willful, we affirm the court's decision to hold Louie in civil contempt.  But we vacate the court's aggregate award of damages. We remand this case for such further proceedings as are necessary for the court to calculate the amount of direct damages to the winning bidders, Anita McRedmond, Linda McRedmond Orsagh, and the late Edward Stephen McRedmond, attributable solely to Louis Anthony McRedmond's civil contempt.

_____
W. NEAL MCBRAYER, JUDGE